Thomas BARBOUR, et al., Petitioners,

v.

DISTRICT OF COLUMBIA DEPART-
MENT OF EMPLOYMENT
SERVICES, Respondent.

Maloney Concrete Co., et al.,
Intervenors.

MALONEY CONCRETE CO., et
al., Petitioners,

v.

DISTRICT OF COLUMBIA DEPART-
MENT OF EMPLOYMENT
SERVICES, Respondent.

Metropolitan Washington Council,
AFL–CIO, Intervenor.

Nos. 83–123, 83–127.

District of Columbia Court of Appeals.

Argued Dec. 4, 1984.

Decided Oct. 8, 1985.

Oliver Denier Long, Bethesda, Md., and Kenneth Henley, Philadelphia, Pa., were on brief, for petitioner in No. 83–123.

William H. Willcox, Washington, D.C., with whom Gary L. Melampy, Washington, D.C., was on brief, for petitioners in No. 83–127 and intervenors in No. 83–123.

Grace Lockett Rosner, Washington, D.C., for respondent.

Jonathan G. Axelrod, Washington, D.C., with whom William W. Osborne, Jr., Washington, D.C., was on brief, for intervenor, Metropolitan Washington Council, AFL–CIO.

Before PRYOR, Chief Judge, and NEWMAN and BELSON, Associate Judges.

NEWMAN, Associate Judge:

Barbour, et al. (employees) seek review of the decision by the Department of Employment Services (DOES) which denied their applications for unemployment compensation based on a finding that they voluntarily left their jobs without good cause connected with the work under D.C.Code § 46–111(a) (Supp.1982). The employees claim that since their unemployment was a result of a strike, their eligibility can only be determined by the "labor dispute" section, D.C.Code § 46–111(f) (1981).[1] Malo-ney Concrete Co., et al. (employers) seek review of that portion of the decision which applied the definition of "labor dispute" promulgated by the District of Columbia Unemployment Compensation Board (Board) in 18 DCRR § 4604.13 (1983) (regulation) to be "any controversy concerning terms, tenure, or conditions of employment under an existing collective bargaining agreement." Maloney argues that this definition is unreasonable because it is inconsistent with the statute and would not apply to the majority of "labor disputes", i.e., strikes that occur after the expiration of the contract. We agree with the employees that § 46–111(f) is the exclusive means of dealing with eligibility determinations where the unemployment is due to labor disputes. We agree with the employers that the definition of "labor dispute" contained in the regulation is inconsistent with the statute and thus outside the authority of the Board to adopt. We affirm the determination of disqualification, albeit on grounds different from those on which DOES relied.

The facts are undisputed. The employees are members of Teamsters Local 639. The employers are two of six concrete companies that bargain jointly with Local 639. The contract between them expired on May 15, 1982. Negotiations for a new contract began before that date but were fruitless. After the contract expired, the union went on strike. The strike ended in July 1982. The employees sought unemployment compensation benefits for the period during which they were on strike.

An examiner determined that the strike was not a labor dispute within the meaning of the regulation since it did not occur during the term of a collective bargaining agreement; therefore, the statutory "labor dispute" exclusion of § 46–111(f) did not apply. The examiner next

---

1. In pertinent part, § 46–111(f) provides:
 An individual shall not be eligible for benefits with respect to any week if it has been found by the Board that such individual is unemployed in such week as a direct result of a labor dispute, other than a lockout, still in active progress in the establishment where he is or was last employed....

determined that the employees left their work voluntarily, without good cause connected with the work and thus were disqualified for benefits under § 46–111(a). The employees filed an interagency appeal. Upon being notified by DOES of this appeal, the employers sent a letter in response thereto, stating that the employers agreed with the determination of disqualification but disagreed with the "labor dispute" definition contained in the regulations and applied by DOES. While acknowledging that this letter met all the requirements of an appeal save for formally captioning it as such, DOES held that the employers had not perfected an interagency appeal. Thus, DOES did not review the labor dispute definition; it only reviewed the finding of ineligibility under § 46–111(a) (voluntarily quit without good cause connected with the work) as requested by the employees. DOES affirmed the decision of the examiner.[2]

■ Where an administrative agency is delegated broad authority to administer a statutory scheme, we give deference to reasonable constructions of such regulatory statute by the agency. *Nova University v. Educational Institution Licensure Commission*, 483 A.2d 1172, 1190 (D.C.1984); *Hager v. District of Columbia Department of Consumer and Regulatory Affairs*, 475 A.2d 367, 368 (D.C.1984). We have cited with approval for this proposition Supreme Court cases such as *Red Lion Broadcasting Company v. FCC*, 395 U.S. 367, 381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969), and *SEC v. Chenery Corp.*, 332 U.S. 194, 207–08, 67 S.Ct. 1760, 1582–83, 91 L.Ed. 1995 (1947). *See Gomillion v. District of Columbia Department of Employment Services*, 447 A.2d 449, 451 (D.C.1982). Thus we now turn to the

question: is the construction given to the "labor dispute" disqualification provision by the regulation a reasonable one?

Insofar as relevant here, the "labor dispute" disqualification of § 46–111(f) has remained basically unchanged since 1935. *See National Broadcasting Co. v. District Unemployment Compensation Board*, 380 A.2d 998, 999–1000 n. 2 (D.C.1977). We have had previous occasions to consider the meaning of that term as included in § 46–111(f). We first were called on to address this provision in *Washington Post Co. v. District Unemployment Compensation Board*, 377 A.2d 436 (D.C.1977). In that case, we attempted no definition of "labor dispute" but rather "[f]or the purposes of [that] appeal accept[ed] the Appeals Examiner's definition...." *Id.* at 440 n. 9. That Appeals Examiner had defined a labor dispute as:

> any controversy concerning wages, hours, working conditions, or terms of employment, arising out of the respective interest of an employer and employee, or a dispute over such matters arising between the parties regardless of whether they stand in the proximate relation of employer and employee.

*Id.* at 437 n. 1.[3] Our second case examining the provision was *Washington Post Co. v. District Unemployment Compensation Board*, 379 A.2d 694 (D.C.1977). In that case, the Board awarded compensation to a member of one union who refused to cross a picket line posted by another union which was on strike. Relying on decisions from other jurisdictions, *e.g.*, Pennsylvania, Maryland, New Jersey and Connecticut, we held that a "voluntary failure or refusal by a member of a non-striking union to pass through a picket line at his place of employment ... constitute[s] active participation

---

**2.** We reject the contention of DOES that the employers' petition for review is not properly before us because they failed to perfect an interagency appeal. At oral argument, the General Counsel of DOES conceded: (1) that the employers' letter met all the requirements of an appeal save for being formally captioned an appeal, and (2) that the same letter would have

been deemed a proper appeal if filed by an individual *pro se*. We find no merit to this hypertechnical distinction.

**3.** This definition is basically the same as that contained in the National Labor Relations Act, 29 U.S.C. § 152(9) (1982). *See infra* at 125.

in a labor dispute . . . [which] necessitates a claimant's disqualification from the receipt of unemployment compensation." *Id.* at 697 (footnotes and citations omitted). Our next case evaluating the "labor dispute" disqualification was *National Broadcasting Co. v. District Unemployment Compensation Board, supra.* There, we reversed a ruling by the Board that employees who were locked out by an employer after the expiration of a collective bargaining agreement and while negotiations about a new agreement were in process were not disqualified from receiving benefits by the "labor dispute" provision. While noting that the statute does not define "labor dispute", *id.,* 380 A.2d at 999 n. 2, we held that the lockout involved in that case was a "labor dispute" within the meaning of the statutory disqualification.[4] Finally, in *Adams v. District Unemployment Compensation Board,* 414 A.2d 830 (D.C.1980), we approved the Board's use of the definition of "labor dispute" found in the National Labor Relations Act. That definition is as follows:

> The term "labor dispute" includes any controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in the proximate relation of employer and employee.

29 U.S.C. § 152(9).

■ In determining the meaning of the term "labor dispute" we must first look to the statute for a definition. Where, as here, none is given, we next look at the language of the statute itself to see if it is plain and can rationally bear only one meaning, *Peoples Drug Stores v. District of Columbia,* 470 A.2d 751, 753 (D.C.1983) (en banc), for generally the intent of the legislature can be found in the language used in the statute. *Varela v. Hi-Lo Pow-*

*ered Stirrups, Inc.,* 424 A.2d 61, 64 (D.C. 1980) (en banc). Words of a statute must be construed by their common meaning and their ordinary sense. *Davis v. United States,* 397 A.2d 951, 956 (D.C.1979). *See generally Caminetti v. United States,* 242 U.S. 470, 485–86, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917). We also examine the legislative history. *Peoples Drug Stores v. District of Columbia, supra,* 470 A.2d at 753–55. In the final analysis:

> it must be remembered that statutory interpretation is an "imperfect science," *Schiaffo v. Helstoski.* 492 F.2d 413, 428 (3d Cir.1974), and "generalities about statutory construction help us little. They are not rules of law but merely axioms of experience." *United States v. Universal C.I.T. Credit Corp.,* 344 U.S. 218, 221, 73 S.Ct. 227, 229, 97 L.Ed. 260 (1952).

*Gonzalez v. United States,* 498 A.2d 1172, 1176 (D.C.1985).

■ We are satisfied that the common meaning and ordinary sense of the term "labor dispute" would include strikes whether during the term of a collective bargaining agreement or after its expiration. We are reinforced in that view by the fact that the definition of labor disputes contained in the regulation would virtually nullify the statutory exclusion of § 46–111(f), since strikes during the term of a collective bargaining agreement are rare in light of the enforceable no-strike and/or binding arbitration clauses usually contained in collective bargaining agreements. *See generally United Steelworkers of America v. Enterprise Wheel and Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); *United Steelworkers of America v. Warrior and Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers of America v. American Manufacturing Co.,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *Textile Workers Union of*

---

**4.** The statute was subsequently amended to exclude "lockout" from the "labor dispute" dis-

qualification. *See supra* note 1.

*America v. Lincoln Mills of Alabama,* 353 U.S. 448, 77 S.Ct. 923, 1 L.Ed.2d 972 (1957).[5]

While the legislative history of § 46–111(f) itself is sparse, *see National Broadcasting Co. v. District Unemployment Compensation Board, supra,* 380 A.2d at 999 n.2, we are not without helpful materials on the issue of Congress' intended meaning of that provision. The District of Columbia Unemployment Compensation Act (the D.C.Act) was adopted by Congress on August 28, 1935. As enacted, the D.C.Act disqualified participants in a "strike or jurisdictional labor dispute...." Pub.L. No. 386, 49 Stat. 946 (1935). On August 31, 1954, Congress enacted Pub.L. No. 721, 68 Stat. 988, which deleted, inter alia, the terms "strike or jurisdictional" leaving the provision to read "labor disputes." The Supreme Court has construed the language of the Act as originally enacted—"strike or jurisdictional labor dispute" —to mean "labor dispute." *New York Telephone Co. v. New York State Department of Labor,* 440 U.S. 519, 543 n. 41, 99 S.Ct. 1328, 1342 n. 41, 59 L.Ed.2d 553 (1979) (plurality opinion). The same Congress which adopted the D.C.Act also adopted the National Labor Relations Act (NLRA), Pub.L. No. 198, 49 Stat. 449, enacted July 5, 1935,[6] as well as Title IX of the Social Security Act (SSA), Pub.L. No. 271, 49 Stat. 639, enacted August 14, 1935.[7]

The primary reason for enacting the NLRA was the need to bring stability to labor-management relations by "equitably and delicately structuring the balance of power among competing forces so as to further the common good." *Motor Coach Employees v. Lockridge,* 403 U.S. 274, 286, 91 S.Ct. 1909, 1917, 29 L.Ed.2d 473 (1971). The NLRA establishes a national policy "of allowing the free play of economic forces to operate during the bargaining process." *New York Telephone Co. v. New York State Department of Labor, supra,* 440 U.S. at 531, 99 S.Ct. at 1336. *See also Machinists v. Wisconsin Employment Relations Comm'n,* 427 U.S. 132, 140, 96 S.Ct. 2548, 2553, 49 L.Ed.2d 396 (1976); *American Ship Building Co. v. NLRB,* 380 U.S. 300, 316–17 (1965); *Teamsters Union v. Morton,* 377 U.S. 252, 258–61, 84 S.Ct. 1253, 1257–59, 12 L.Ed.2d 280 (1964).

---

**5.** That this was the specific purpose of the regulation is made clear from the transcripts of the Board meetings where it was adopted and ultimately promulgated. The circumstances surrounding its adoption are also illuminating. The Board is composed of two employee representatives, two employer representatives, and a chairperson appointed by the Mayor; the chairperson votes only in case of a tie vote. At the June 18, 1981, meeting, where the Board voted to adopt the definition contained in the regulation, both employer representatives were present. At the October 22, 1981 meeting the regulation was finally promulgated. Only one employer representative was present. The Board voted to adopt and to promulgate the definition by a vote of 2–1 (the employee representative voting to adopt and later to promulgate; the employer representative voting against both). This was done in spite of the opposition of the chairperson and the advice of counsel to the Board "that the definition ... will be difficult to defend [in] Court because the definition ... appears to fly in the face of the legislative intent that people engaged in labor disputes be disqualified while those labor disputes are in active progress." Transcript, D.C. Unemployment Compensation Board Meeting at 2 (Oct.

22, 1981) (statement of Grace Rosner, Board Counsel). In response to such advice both from counsel and by the chairperson, one of the employee representatives said "You expressed that last time, I have some appreciation for it, but we said, we'd fly and take our chances." *Id.* at 9–10 (statement of Russ Binion). Later, after the chairperson opined that the change might be good social policy and good politics but argued that the regulation was contrary to the statute, the same employer representative said:

I think, you know, we acknowledged that, at least, [counsel] made basically the same comments that she's made today, and we acknowledged, that it's a tough course we may have to travel if we get challenged on this, but I believe that it's, that it's winnable, and I think it's, it's right; and, I think it's socially advanced.

*Id.* at 11.

**6.** As amended 29 U.S.C. § 151 *et seq.*

**7.** As amended and recodified as the Federal Unemployment Tax Act, 26 U.S.C. § 3301 *et seq.* (1982 & Supp.1983), 42 U.S.C. §§ 501 *et seq.,* –§§ 1101 *et seq.* (1982).

As a preeminent scholar in this area has said:

> An appreciation of the true character of the national labor policy expressed in the NLRA ... indicates that in providing a legal framework for union organization, collective bargaining, and the conduct of labor disputes, Congress struck a balance of protection, prohibition and laissez faire in respect to union organization, collective bargaining, and labor disputes....

Cox, *Labor Law Preemption Revisited,* 85 HARV.L.REV. 1337, 1352 (1972). *See also* H. Wellington, Labor and the Legal Process, ch. 2 (1968).[8]

 Six weeks after it enacted the NLRA, the same Congress enacted the SSA. That act established a system whereby the federal government will partially fund a state unemployment system which meets certain criteria. The District of Columbia has such a qualifying system. The Supreme Court has held that nothing in federal labor policy, established by NLRA, SSA or otherwise, prohibits a state from paying unemployment compensation to persons out of work because of a strike or other labor dispute. *New York Telephone Co. v. New York State Department of Labor, supra.* The Court pointed out that Congress had rejected all attempts to amend federal statutes to prohibit the states from paying benefits to those persons unemployed because of a labor dispute. *Id.,* 440 U.S. at 544 n. 44, 99 S.Ct. at 1343 n. 44. And in language particularly significant to this case, the Court, in discussing the issue presented, federal preemption, said:

> During the hearings on the Social Security Act, written submissions offered by both Edwin Witte, Director of the President's Committee on Economic Security, on behalf of that Committee's Advisory Council, and Abraham Epstein, representing the American Association for Social Security, a citizen's group devoted to promoting social security legislation, recommended withholding benefits from strikers during a strike. Hearings on S. 1130, *supra* n. 36, at 228, 472. An even stronger suggestion, which would have disqualified strikers even after the strike was over, was made by a spokesman for the National Association of Manufacturers.
>
> It is also probative that just two weeks after the Social Security Act became law Congress, in its capacity as the legislature for the District of Columbia, passed an unemployment program for that locality which expressly precluded strikers from receiving benefits so long as a labor dispute was in "active progress." Act of Aug. 28, 1935, ch. 794, § 10(a), 49 Stat. 950. *That it included the restriction in the local Social Security Act, but not in the national one, suggests the strength of its commitment to free local choice.* That it did so is also important evidence that it neither assumed nor intended that its passage of the NLRA seven weeks earlier would preempt the payment of benefits to strikers in any case.
>
> Of these four antistriker proposals considered by Congress during 1935, it is interesting to note that three allowed former strikers to receive benefits once the strike was ended. In light of these provisions, it seems clear that Congress perceived the opposition to such benefits not simply as a reflection of the view that voluntary unemployment should never be compensated but also as a concern with the nonneutral impact of such benefits on labor disputes. Its refusal explicitly to go along with that opposition on the *national* level with respect to the Social Security Act is thus all the more relevant to its intent in passing the NLRA several weeks earlier.

*Id.,* 440 U.S. at 543 n. 41, 99 S.Ct. at 1342 n. 41 (emphasis added). Given the fact that the same Congress enacted the NLRA, the SSA and the D.C.Act, all within 60 days of

---

**8.** As previously noted, the NLRA contains a definition of "labor dispute." *See supra* pg. 126.

The definition is unchanged from its enactment in 1935.

each other, we are satisfied that it knew what it was about when it permitted state legislatures to authorize unemployment benefits to persons unemployed as the result of a strike but, when acting as the "state" legislature of the District of Columbia, also determined not to authorize such payments locally.[9] *New York Telephone* stands for the proposition that a state (or the District of Columbia) can choose whether to pay unemployment benefits to those unemployed by virtue of a labor dispute. It does not authorize the Board to eviscerate congressional intent by promulgating a regulation. We hold that a strike after the expiration of a collective bargaining agreement as well as one during the term of the agreement is a labor dispute within the meaning of § 46–111(f) of the Act.[10] The definition of "labor dispute" contained in the regulation is null and void.[11]

For the foregoing reasons, we affirm the ruling of DOES that Barbour, et al. are disqualified for benefits.

*So ordered.*

---

**9.** There is nothing that indicates that Congress intended a different result when it amended the D.C. Act in 1954.

**10.** We do not purport to give a comprehensive definition to the term. Rather, we hold that as used in the statute, the term covers strikes both during and after the expiration of an agreement.

**11.** Since we hold that the employees were disqualified because of the "labor dispute" provision, we need not address the "good cause for leaving the job" issue decided by DOES.